60 CCPA

**UNITED PURVEYORS, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5461.**

United States Court of Customs and Patent Appeals.

Dec. 29, 1972.

Eugene C. Heiman, Heiman & Crary, Miami, Fla., William D. Stokes, Washington, D. C., attorneys, of record, for appellant.

L. Patrick Gray, III, Asst. Atty. Gen., Andrew P. Vance, Chief Customs Section, James Caffentzis, New York City, for the United States.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

RICH, Judge.

This appeal is from the judgment of the United States Customs Court, Third Division, 65 Cust.Ct. 566, C.D. 4139 (1970), overruling appellant's consolidated protests against the classification of certain melons imported from El Salvador between January 22 and March 25 of 1964. We reverse.

Appellant claims that the "Honey Rock" melons imported were not properly classified as "cantaloupes" under TSUS item 148.15, but rather should be classifiable as "other melons" under TSUS item 148.25 which carries a lower duty.

The applicable statutory sections, in pertinent part, are:

Tariff Schedules of the United States:

Schedule 1, Part 9, Subpart B:

\* \* \* \* \* \*

Melons, fresh, or prepared or preserved:
  Fresh:
    Cantaloupes:
      If entered during the period from August 1 to September 15, inclusive, in any year
      \* \* \*
      \* \* \* \* \* \*
148.15    If entered at any other time ... 35% ad val.
    Other melons:
148.25    If entered during the period from December 1, in any year, to the following May 31, inclusive 17.5% ad val.

The Customs Court refused to consider as evidence the record in a prior case, United Purveyors, Inc. v. United States, 61 Cust.Ct. 9, C.D. 3508 (1968), which record the court found appellant had moved to incorporate without having given appellee the notice required by Customs Court Rule 20. With consideration thus limited to the evidence of record, the Customs Court found appellant to have failed to prove error in the collector's presumptively correct classification of the melons as "cantaloupes." The Customs Court said:

The importer's case rests solely upon two things: The testimony of a witness whose experience, knowledge and familiarity with the characteristics of, and the trade and commerce in, cantaloupes and other melons are unknown factors; and a melon (or photograph thereof) taken from the end of the current (1970) crop which happened to be, as plaintiff's [appellant's] counsel candidly stated "the best available object."

The court assumed the first factor, the qualifications of the witness, but found "The assertion that exhibit 1 is a valid representative sample of merchandise imported some six years earlier is totally unsupported by any other evidence of record."

We have considered the record in detail and find appellant's witness Susskind amply qualified for the purposes for which his testimony is introduced and find the "end of the season melon" sample to adequately represent the nature of the imported melons, on which basis we reverse.

### The Qualifications of the Witness

■ The witness Susskind was secretary-treasurer of the importer, United Purveyors, during the period of the importation of the melons under these protests. He was "in charge of the distribution of produce," and responsible for sales of the imported produce from foreign countries which was imported into the United States for national distribution. His testimony, in the main, deals with the purchase, importation, inspection, and sale of the melons allegedly involved in these protests and a description and comparison of the physical differences between the sample "Honey Rock" melon, in evidence as exhibit 1, and cantaloupes. We find his position and responsibilities in United Purveyors, Inc., which is supported by uncontroverted statements in the record, to render him amply qualified for the first task and more than qualified for the second which uses his knowledge of produce as a basis but generally relates to a description of that which his senses perceive from the sample melon which was before him.

■ The opinion of the Customs Court is to the effect that the record also does not establish that the melon in evidence at trial, and in evidence before us as a photograph, exhibit 1, was a valid representative sample of the merchandise imported some six years earlier. We disagree. There is sufficient testimony of the witness Susskind, uncontroverted by any evidence of record, to establish a prima facie case that the sample melon represents the imported melons.

Basically, appellee asserts two reasons why exhibit 1 is not a representative sample of the imported melons. The first apparently resides in the witness's characterization of the exhibit as an "end of the season melon" and is explained by the following paragraph in appellee's brief:

> To illustrate this point, appellee notes that the witness Susskind stated that Plaintiff's Exhibit 1 was an "end of the season" melon (R. 17), which came from the "last shipment of the season" (R. 17), approximately two to three weeks prior to trial (R. 17, 21). Since trial was held on March 3rd (R. 14), the last shipment of these melons occurred sometime between February 10th and February 17th. Yet the involved merchandise *was not described as the last shipment of the season*, and arrived in the United States as late as March 27th. Appellant offered no proof to overcome this glaring defect in its claim that Plaintiff's Exhibit 1 was representative of the imported merchandise.

The gist of this argument is that the merchandise under the original protests should also have been described as "end of the season" melons because the calendar dates suggest that these melons were grown about the same time of year as the sample melon so described. While the imported melons may have also been grown late in the season, we do not find this to be a glaring defect which appellant must overcome by proof. While appellee correctly notes that the imported melons "arrived in the United States as late as March 27th," it fails to recognize that the melons also arrived in this country as early as January 22nd, the earliest date of entry of the melons under the consolidated protests here. The period of time over which these importations took place does not support appellee's contention that the imported melons must, or should, have also been described as "end of the season" produce.

The second reason given by appellee why exhibit 1 is not a representative sample of the melons imported is an alleged failure of the testimony of Mr. Susskind to prove that he specifically

examined the merchandise which was imported when he testified that exhibit 1 "has the same appearance as the melons as are involved in this case." Appellee alleges:

> Not only did the witness admit that he could not relate any examination to the specific merchandise at bar (R. 25, 31), but he also admitted that he did not know whether he was at work during any specific date in 1964 (the relevant period herein) (R. 26).

While we note that the witness Susskind admitted upon cross-examination that he did not "remember the actual examination of the involved merchandise," we note that no evidence has been introduced to controvert witness Susskind's specific testimony that he brought with him to the trial the melon identified as exhibit 1 "which has the same appearance as the melons as are involved in this case," or his testimony that he did "personally see the melons which were imported * * *." Following are portions of Mr. Susskind's testimony showing the nature of his job and experience with the importer and including the portions of testimony relied upon by appellee to show his inability to remember examination of the merchandise under protest:

Q. Did you bring with you a melon which has the same appearance as the melons as are involved in this case? A. Yes.

*   *   *   *   *   *

Q. You have handed me a melon, did you personally see the melons which were imported from El Salvador, which are under calendar numbers 105 through 117? A. Yes, I did.

*   *   *   *   *   *

Q. Mr. Susskind, you said that you personally saw the involved merchandise? A. That is correct.

Q. * * * Have you seen the entry papers of the involved merchandise? A. I don't recall seeing the entry papers.

Q. Would you tell the Court where and when you saw the involved merchandise? A. When it was delivered from the airport in which it arrived—at the airport in Miami to our warehouse at 12th Avenue and 21st Street.

Q. Will you tell the Court when this was? A. Over a period of time, whenever the shipment arrived.

Q. How many shipments arrived at your warehouse in the course of a year, Mr. Susskind? A. It runs into thousands.

Q. Do you inspect every crate? A. Only the ones for which the sale of which I am responsible.

Q. What is your position at United Purveyors? A. At the present time I am retired.

Q. In 1964 and 1965 what was your position at United Purveyors? A. I was secretary-treasurer of the company, in charge of the distribution of produce.

Q. Which sales were you responsible for? A. Produce.

Q. Were you responsible for sales of imported merchandise from foreign countries? A. Produce only.

Q. Will you explain to the Court what produce? A. Fruits and vegetables.

Q. You are responsible for all fruits and vegetables? A. Only those that were imported for national distribution.

Q. How many shipments of this did you have in 1964 and '65? A. I couldn't recall. I would say it might be in the vicinity of 100.

Q. You personally inspect every shipment? A. I inspect samples of every shipment, yes, the ones that I am responsible for for sale. I did, I was responsible for; now I am not.

Q. Do you recall January 22, 1964 as a date in which a shipment arrived at your warehouse? A. I couldn't specify to that, no.

Q. Could you specify that you examined some samples on that date? A. If they were Honey Rock melons, I did.

Q. Do you have an actual recollection of examining these, or do you just know that you should have? A. I know

that I must have. I don't recall exactly that date and the melons that arrived that date.

Q. Do you recollect any actual sampling? A. It wasn't a matter of sampling. I inspected it because I know what I had for sale.

Q. Did you inspect every shipment? A. I inspected samples of every shipment that arrived.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. From when it arrives at your warehouse what happens to the merchandise then? A. If it is this type of merchandise, after inspection it goes in the refrigerated area.

Q. If you are not there who makes the inspections? A. It would go into the refrigerated area, and be held until I got there, until I could make the inspection.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. Were you at work on January 22, 1964? A. I couldn't answer that.

Q. How about January 28, 1964? A. I couldn't answer that.

Q. How about February 3, 1964? A. I couldn't answer to any specific date back in 1964.

Q. And you say you cannot specifically remember any single examination of the involved merchandise. A. That is correct.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. Do you do all the examination for ripeness? A. Only on the merchandise for which I was responsible for retail.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. Has it ever been your experience that merchandise that you were responsible for has gone out of your warehouse without you actually examining it for one reason or another? A. No.

Q. Never? A. No.

Q. Have you ever been ill for a prolonged period of time?

Mr. Heiman: I object unless it is limited to the period of time in suit.

Chief Judge Rao: Objection sustained.

By Mr. Baskin:

Q. Let's see if I can clarify one point, then we will excuse you. You did state that you don't remember the actual examination of the involved merchandise, is that correct? A. That is correct.

As noted, despite the fact that he was admittedly responsible for the merchandise and it was his experience that such merchandise "never" went out of his warehouse without his actually examining it, appellee relied for the alleged failure of the witness to identify exhibit 1 as a representative sample of the merchandise imported through his warehouse on thirteen different entry dates upon the witness's apparently forthright admission on March 3, 1970, that he "couldn't answer to any specific date back in 1964" whether he was at work on that date. We do not think this admission of the fallibility of memory defeats appellant's prima facie showing that this sample melon is representative of the shipments. No evidence controverts the witness's testimony that he saw the shipments here—shipments which were admittedly within his assigned responsibility—or indicates that Mr. Susskind was not actually at work on any of the thirteen days when the melons entered the warehouse.

Finally, we note from the record that inspection of these shipments was not the only way in which the witness Susskind was able to identify the imported melons as "Honey Rocks" with the characteristics of exhibit 1. The witness saw these melons in El Salvador on the grower's ranch. When the grower said that he didn't have the cantaloupes originally called for by the importer's contract, the witness representing the importer "flew down there, to the ranch on which he grew the melons, and," as he stated, "there were the Honey Rock &ast; &ast; &ast;." The witness testified that "when I saw he had the Honey Rocks I accepted them all on its [my?] own."

No evidence controverts the witness's testimony in this respect and accordingly we find that exhibit 1 is prima facie a

representative sample of the imported melons. See United Cutlery & Hardware Prods. Co. v. United States, 54 Cust. Ct. 436, Abs. No. 69323 (1965).

The following colloquy with the witness establishes the differences between the Honey Rock melon and cantaloupes:

Q. And would you explain to the Judge from the external appearance what the difference is between the melon which you have in front of you, and sold as Honey Rocks, and the melon as sold as cantaloupe? A. Differing from this, the cantaloupe is a pearl grey color, and covered with a heavy netting.

Q. Would you tell the Court the texture of the meat, if any— A. The cantaloupe is firm, and Honey Rock is soft, loose and watery.

Q. What is the difference of the texture of the skin? A. The skin of the Honey Rock melon is smooth, and the skin of a cantaloupe is rough, because of the netting.

Q. Now, with regard to hardness or tenderness, would you tell the Court what you have observed to be the difference between the cantaloupe and the Honey Rock melon? A. The Honey Rock melon is soft; the cantaloupe is firm and hard skinned.

\* \* \* \* \* \*

Q. With regard to the usual size of the Honey Rock melon as compared to the cantaloupe, would you tell the Court what you have observed? A. This is about as small as Honey Rock will run. It is as large, or perhaps a little larger than the cantaloupes that are on the market.

In view of this uncontroverted testimony establishing the differences between the "Honey Rock" melon and cantaloupes, supported by the photograph representing exhibit 1 before this court, we find that the imported melons are not "cantaloupes" and are therefore "other melons," entering during the period from December 1, to May 31, within the meaning of TSUS item 148.25 and are therefore dutiable at the rate of 17.5%

ad val. This showing establishes a prima facie case which overcomes the presumption of correctness attaching to the collector's classification of the merchandise as "cantaloupes." United States v. Samuel Shapiro & Co., 18 CCPA 165, T.D. 44374 (1930). This conclusion is in accordance with the general principles which were formulated with respect to melons designated as "Honey Rocks" in United Purveyors, Inc. v. United States supra, under the predecessor classification statute, Tariff Act of 1930, as modified by T.D. 51802, Paragraph 752. United States v. Masson, 5 Ct.Cust. Appls. 307, 308, T.D. 34479 (1914).

For the foregoing reasons, the judgment of the Customs Court is reversed.

Reversed.